**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mandeli JACKSON, Joseph Davis, and
Romano Gines,
Defendants–Appellants.**

**Nos. 89–3287, 89–3328 and 89–3385.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 11, 1991.

Decided June 14, 1991.

---

James Porter, Asst. U.S. Atty., East St. Louis, Ill., for U.S.

Michael Dwyer, Office of the Federal Public Defender, St. Louis, Mo., for Mandell Jackson.

James W. Ackerman, Springfield, Ill., Richard F. Spencer, Jr., Cincinnati, Ohio, for Joseph L. Davis.

Bradford Hunt, Alton, Ill., for Romano Gines.

Before CUMMINGS and FLAUM, Circuit Judges, and GRANT, Senior District Judge.*

FLAUM, Circuit Judge.

Mandell Jackson, Joseph Davis, and Romano Gines were each indicted and convicted of one count of conspiring to distribute over 50 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846. In addition, Davis was indicted and convicted of one count of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848 and three counts of money laundering in violation of 18 U.S.C. § 1956(a). Jackson and Gines were sentenced to 210 months each. Davis was sentenced to 30 years. We affirm the convictions, but remand Gines' case for resentencing because we conclude that the district court erroneously increased his offense level by applying an obstruction of justice enhancement.

## I. FACTS AND PRIOR PROCEEDINGS

The Reverend Joseph Davis describes himself as "a small-time, hellfire and brimstone country preacher." Supplemental Brief at 14. The evidence at trial, however, presented a more complete view of Mr. Davis' talents. It showed how he repaired a run-down East St. Louis church and revitalized its congregation, helping to restore the social fabric of a community in distress. Sadly, it also showed that Davis devoted his considerable skills to a variety of schemes that ranged from shady to downright illegal. One of these schemes was the ongoing distribution of late-twentieth century America's counterpart to brimstone, crack cocaine.

Davis became the preacher at the 15th Street Baptist Church in the mid–1980s. Shortly thereafter he began to sell drugs, and by mid–1987 was actively selling crack from two houses, the first at 735 Wabashaw and the second at 1479 Belmont. The Wabashaw house was managed by Dwayne Scruggs and the Belmont house by Mandell Jackson. Scruggs and Jackson directed teams of addicts who would sell crack on the streets around the houses as well as to passing motorists. They were paid for their efforts in crack. These addicts had occasional contacts with Davis, who would visit the houses to replenish the drug supply and collect cash. During the visits Davis would typically confer with the house manager privately. If the cocaine Davis supplied came in powder form, Jackson or Scruggs would cook it into cocaine base which they would then divide into smaller portions and distribute to the sellers for resale. At the Belmont house, Romano Gines helped with the cooking and otherwise assisted Jackson in running the house.

Davis deposited some of the cash he collected from the houses in bank accounts maintained in the name of the 15th Street Baptist Church Development Corporation ("Development Corporation account") and the 15th Street Baptist Church ("Church account") at Illini Federal, a local savings and loan. Also deposited in the Development Corporation accounts were funds that Davis and the Corporation obtained from other activities. One of Davis' other activities was steering his parishioners and others to used-car outlets in the East St. Louis area in return for commissions from the

---

* The Honorable Robert A. Grant, Senior District Judge, United States District Court for the Northern District of Indiana, is sitting by designation.

dealers, a practice known as "bird-dogging." Davis would secure consumer credit for the cars and other purchases he helped to arrange through Sam Bennett, a loan officer at Jefferson Bank & Trust in St. Louis. Bennett, it is alleged, would turn a blind eye to the inability of many of the borrowers Davis sent his way to repay their obligations to Jefferson. In return, he and Davis would split the fees they received for arranging these loans. Davis also deposited in the Church and the Development Corporation accounts funds he received from more legitimate activities, including a contract for the Corporation to demolish a building in East St. Louis.

Davis could write checks on these accounts. Some of these checks were made out to cash, which Davis diverted to his personal use. Others were made out to local vendors who provided services such as beepers and mobile telephones. Still others were made out to the landlord who owned the Swansea, Illinois, residence where Davis lived. Davis also purchased numerous cars, spending over $79,000 on a variety of vehicles for personal and church use between October 1987 and November 1988.

East St. Louis police, assisted by officers of the Illinois Department of Criminal Investigation and the Drug Enforcement Administration, began to investigate Davis' activities after a raid on the Wabashaw Avenue drug house—owned by Davis' mother—in September 1988. In early December 1988, Marcie Rupert, who sold crack at the Belmont house, told Illinois state trooper Terry Delaney that Davis had raped her. She also described Davis' role in the operation of the Belmont and Wabashaw crack houses. On December 22, 1988, East St. Louis police officers looking for a runaway 13–year–old girl entered the Belmont Avenue house. They found the girl, and saw drug paraphernalia and several guns lying around the house in plain view. They also met the dozen or so individuals who occupied the house, including Romano Gines and Mandell Jackson. Later the same day, an undercover DEA agent approached the Belmont house and consummated a drug transaction with another of its occupants, Romano Gines. Subsequent arrests of a number of sellers who worked out of the houses yielded additional information implicating Davis.

In February 1989 police arrested Scruggs while he was carrying a quarter-ounce of cocaine. A search of Scruggs' home revealed weapons. In April 1989 he was joined in custody by Davis, Jackson, and Gines. Davis was searched and was found to be carrying over $1,000 in cash. A search of his home uncovered a precision scale, more guns, and numerous plastic sandwich bags, some of which contained traces of cocaine. The office at the Fifteenth Street Baptist Church was also searched, yielding another precision scale and records of the Church and Development Corporation bank accounts. These records revealed that from October 1987 to February 1989, over $191,000 had been deposited in the Development Corporation account. Of this amount, over $100,000 was deposited in cash.

A grand jury in the Southern District of Illinois indicted Davis, Gines, Jackson, and Scruggs of conspiring to distribute over 50 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846. In addition, Davis was indicted for engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. Davis was also charged with four counts of laundering funds derived from drug activities in violation of 18 U.S.C. § 1956(a)(1). One count was based on a series of checks drawn on the Development Corporation account and made out to providers of cellular telephone and paging services. Another was based on checks drawn on the same account and made out to Davis' landlord. A third was based on a series of Development Corporation checks that Davis or the church secretary presented at the savings and loan in return for cash. The last count was based on Davis' use of $5,500 in cash derived in part from his drug activities to purchase a car.

Scruggs plead guilty to conspiracy and testified against his former confederates at their joint trial. At the close of this trial, Davis, Gines, and Jackson were each found guilty of conspiring to distribute cocaine

base. The jury also found Davis guilty of engaging in a continuing criminal enterprise, and of three of the four counts of money laundering. The jury acquitted Davis of the money laundering count arising from the purchase of the car. All three appeal, raising a plethora of arguments to which we now turn.

## II. VOID FOR VAGUENESS—MONEY LAUNDERING (DAVIS)

We first discuss Davis' argument that the money laundering statute under which he was convicted in counts three through five, 18 U.S.C. § 1956(a)(1), violates his constitutional right to due process because it is impermissibly vague. The government responds that as applied to Davis the statute gave ample notice that the conduct he engaged in was prohibited.

■ In evaluating a vagueness challenge, it is not enough to conclude "that Congress might, without difficulty, have chosen '[c]learer and more precise language' equally easily." *United States v. Powell*, 423 U.S. 87, 94, 96 S.Ct. 316, 321, 46 L.Ed.2d 228 (1975) (quoting *United States v. Petrillo*, 332 U.S. 1, 7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1947)). Rather, "the void-for-vagueness doctrine requires only that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *see United States v. Van Hawkins*, 899 F.2d 852, 853–54 (9th Cir.); *United States v. Pinelli*, 890 F.2d 1461, 1470 (10th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 2568, 109 L.Ed.2d 750 (1990). The second of these two aspects is more important than the first, *see id.* 461 U.S. at 358, 103 S.Ct. at 1858, and bars criminal statutes "of such a standardless sweep [as to] allow[ ] policemen, prosecutors, and juries to pursue their personal predilections." *Smith v. Goguen*, 415 U.S. 566, 575, 94 S.Ct. 1242, 1248, 39 L.Ed.2d 605 (1974). "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 1858, 100 L.Ed.2d 372 (1988); *see United States v. Barnes*, 890 F.2d 545, 552 (1st Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990).

■ As applied to Davis, we conclude that § 1956 is not unconstitutionally vague. The two provisions of 18 U.S.C. § 1956 under which Davis was charged provide, in relevant part, that:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of illegal activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

\* \* \* \* \* \*

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity;

\* \* \* \* \* \*

shall be sentenced to a fine of not more than $500,000 or twice the value of the property derived in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

We first note that this provision requires the government to prove that a defendant charged with participating in the financial transaction identified in the indictment knew that it involved the proceeds of unlawful activities. In a case brought under § 1956(a)(1)(A)(i), the government must also prove that the defendant intended to promote the carrying on not just of any criminal activity, but rather the limited number of activities identified in § 1956(c)(7), which defines the term "specified unlawful activity." In a case brought under § 1956(a)(1)(B)(i), the government must prove that the transaction was de-

signed to conceal one or another of the enumerated attributes of the proceeds involved. *See United States v. Sanders*, 928 F.2d 940, 946 (10th Cir.1991). These requirements of intent and knowledge "do[ ] much to destroy any force in the argument that application of the [statute] would be so unfair that it must be held invalid," *Boyce Motor Lines v. United States*, 342 U.S. 337, 342, 72 S.Ct. 329, 331, 96 L.Ed. 367 (1952), "especially with regard to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). *See, e.g., Colautti v. Franklin*, 439 U.S. 379, 395, 99 S.Ct. 675, 685, 58 L.Ed.2d 596 (1979); *overruled in part on other grounds, Webster v. Reproductive Health Servs.*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989); *United States v. Davenport*, 929 F.2d 1169, 1173 (7th Cir.1991); *United States v. Ortiz*, 738 F.Supp. 1394, 1399 (S.D.Fla.1990).

■ Turning to the second prong of the vagueness test, the specific and detailed definitions given to numerous terms used in the statute, such as "specified unlawful activity," *see* 18 U.S.C. § 1956(c)(7), "financial transaction," *see id.*, § 1956(c)(4), and "transaction," *see id.*, § 1956(c)(3), suggest that in drafting this statute, Congress hardly abdicated its "responsibilities for setting the standards of the criminal law," *Goguen*, 415 U.S. at 575, 94 S.Ct. at 1248. Law enforcement officers are not free to apply the money laundering statute guided solely by their likes and dislikes. *See Kolender*, 461 U.S. at 357–60, 103 S.Ct. at 1858–60. Rather, Congress has limited their discretion by describing with particularity "what a suspect must do in order to satisfy the statute." *Id.* at 361, 103 S.Ct. at 1860. As is discussed more fully below, the evidence established Davis' knowing and intentional use of a bank account controlled by his employer to promote his continued narcotics activities and to hide the source of his tainted gains in an account containing both drug profits and legitimate income. As applied to these facts, the money laundering statute is sufficiently definite to survive a vagueness challenge.

### III. SUFFICIENCY OF THE EVIDENCE—MONEY LAUNDERING (DAVIS)

Davis next asserts that the evidence the jury heard was insufficient to convict him of laundering funds derived from his narcotics activities. Davis points to his various other sources of income, including the money he made bird-dogging cars, arranging purchase-money loans, and demolishing buildings, all of which produced revenue which was deposited into the Development Corporation account. He argues that no rational juror could decide beyond a reasonable doubt that the individual checks and transactions enumerated in counts three through five of the indictment involved money derived from drug activities. The government responds that the testimony of Internal Revenue Service Agent James Wehrheim established that Davis earned approximately $102,500 from non-drug sources during the period of the drug conspiracy charged in the indictment. During the same period, over $200,000 was deposited in the two church accounts to which Davis had access. In light of the other evidence presented at trial, it argues, jurors could rationally infer that the difference was attributable to drug activities. Second, it contends that the money laundering statute does not require the prosecution to prove that the funds used in the various transactions listed in the indictment came exclusively from drug activities, but only that some of it was derived from these activities.

■■ Though Davis styles this argument in terms of the sufficiency of the evidence, we believe that it involves a preliminary question of statutory construction. The question posed is whether a defendant can be convicted under either 18 U.S.C. § 1956(a)(1)(A)(i) or (a)(1)(B)(i) where the transaction that forms the basis of the indictment involves the proceeds of both "specified unlawful activity" as defined in § 1956(c)(7), and other conduct, either innocent or criminal, but not among the enu-

merated criminal activities that may serve as a predicate for a money laundering conviction.

Both of the money laundering provisions Davis was charged under, § 1956(a)(1)(A)(i) and (a)(1)(B)(i), require only that a transaction "involve[ ]" the proceeds of an activity which the participant knows is unlawful, and which in fact "involves" the proceeds of one of the types of criminal conduct identified in § 1956(c)(7). We do not read Congress's use of the word "involve" as imposing the requirement that the government trace the origin of all funds deposited into a bank account to determine exactly which funds were used for what transaction. Moreover, we cannot believe that Congress intended that participants in unlawful activities could prevent their own convictions under the money laundering statute simply by commingling funds derived from both "specified unlawful activities" and other activities. Indeed, the commingling in this case is itself suggestive of a design to hide the source of ill-gotten gains that the government must prove under § 1956(a)(1)(B)(i). *See United States v. Sutera*, 933 F.2d 641, 645 (8th Cir., 1991).

The risk that this reading of the statute will have unduly harsh consequences is mitigated by the requirements imposed upon the government by other parts of the statute. To convict under § 1956(a)(1)(A)(i), the government bears the burden of proving beyond a reasonable doubt that the party engaged in the transaction knew that the funds used represented, in whole or in part, proceeds of an unlawful activity and intended the transaction to promote one of the varieties of criminal conduct identified in § 1956(c)(7). In a case under (a)(1)(B)(i), the government must also prove that the transaction was carried out in whole or in part with the design of concealing "the nature, the location, the source, the ownership, or the control" of the proceeds of one of the forms of criminal conduct enumerated in § 1956(c)(7). It will be a rare case in which these requirements will be satisfied without proof that the funds used in the charged transaction were derived in substantial measure from "specified unlawful activities" rather than from other legal or illegal conduct.

■ Having concluded that § 1956(a)(1)(A)(i) and (a)(1)(B)(i) allow for convictions where the funds involved in the transaction are derived only in part from "specified unlawful activities," we move to the question of whether the evidence at trial was sufficient to convict Davis of violating these provisions when he wrote the various checks identified in the money laundering counts of the indictment. A defendant challenging the sufficiency of the evidence supporting his conviction faces a "formidable" burden

> as we must affirm as long as "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." In making this determination we look to all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the government. We must affirm unless the record is barren of any evidence, regardless of weight, from which the trier of fact could find guilt beyond a reasonable doubt.

*United States v. Atterson*, 926 F.2d 649, 655 (7th Cir.1991) (citations omitted).

We have already set out the elements of a conviction under § 1956(a)(1)(A)(i) and (a)(1)(B)(i). *Ante at* 838-39. We think that a rational juror could find that the government sustained its burden of proving these elements beyond a reasonable doubt as to the transactions charged in counts three through five of the indictment. As to the elements set out in § 1956(a)(1) and common to both (a)(1)(A)(i) and (a)(1)(B)(i), the proof that Davis knew that money derived from his drug organization was deposited in the church account was established, first, by the testimony of Davis' church secretary, who testified that Davis would give her cash to deposit into the Development Corporation bank account. Trial Transcript ("Tr.") at 214. Second, Agent Wehrheim testified as to Davis' sources of cash and established that Davis and the Development Corporation made bank deposits equal to approximately twice the amount that could be accounted for out of

legitimate sources of income. Tr. at 648–52. Over half the total amount of these deposits was in cash. Tr. at 649–650.

■■■ The evidence at trial also established that Davis had access to large amounts of cash. For example, Marcie Rupert testified she had helped him count approximately $35,000 in currency. Tr. at 364. Pierre Manley, who worked as a runner transporting cash from the Wabashaw house to Davis, testified that he would often pick up $1500 a day from the house. Tr. at 196. Reasonable jurors could certainly infer that the cash contained in the deposits Davis made or ordered to be made were derived to a large extent from Davis' drug operations and that Davis knew this. The jury was also entitled to conclude, as it did in deciding that Davis was guilty under count one of the indictment, that Davis' drug-derived funds were the proceeds of a drug operation involving a continuing series of narcotics distributions, composed of five or more other persons, and from which Davis derived substantial income. These findings, taken together, established that Davis was guilty of operating a continuing criminal enterprise within the meaning of 21 U.S.C. § 848(c), one of the "specified unlawful activit[ies]" that may serve as a predicate act under the money laundering statute. 18 U.S.C. § 1956(c)(7)(C). Writing a check, whether for cash or to a vendor who has provided services, falls within the definition of a "financial transaction" contained in § 1956(c)(4)(B) because it involved Illini Federal, a "financial institution ... the activities of which affect[ ] interstate ... commerce." Writing a check drawn on an account maintained in such an institution is also a "transaction" falling within the "very broad[ ]" definition given to that term under the money laundering statute. *See* 18 U.S.C. § 1956(c)(3); S.Rep. No. 433, 99th Cong., 2d Sess. 12–13 (1986); *United States v. Martin*, 933 F.2d 609, 610 (8th Cir., 1991); *United States v. Blackman*, 904 F.2d 1250, 1257 (8th Cir.1990).

■■ Turning to the elements set out in sub-sections (a)(1)(A)(i) and (a)(1)(B)(i) as applied to the conduct charged in the three money laundering counts contained in the indictment, count three charged Davis with issuing seven Development Corporation checks to vendors providing beeper services and mobile telephone services. Pierre Manley testified that Davis gave him a beeper when he began to serve as one of Davis' runners, and that Davis would call Manley's beeper to tell him to contact Davis. When Manley called back, Davis instructed him to drive to the Wabashaw house to make pickups. Tr. at 191–92. This and other evidence of the use of beepers as an integral part of Davis' conduct of his continuing criminal enterprise suffice to establish that the use of the funds derived from Davis' drug activities to purchase beepers was intended to promote this activity, establishing a violation of § 1956(a)(1)(A)(i).

■■ We are, however, unable to view the mobile phone purchases that comprise the remainder of count 3, the rental payments alleged in count 4, or the checks written to cash charged in count 5 as intended to promote the continued operations of Davis' continuing criminal enterprise under § 1956(a)(1)(A)(i). The government did not prove that the cellular phones played the same role—or indeed, any role—in Davis' drug operations as the beepers. Likewise the rental payments and the checks written to cash; certainly these expenditures maintained Davis' lifestyle, but more than this is needed to establish that they promoted his drug activities. These transactions, however, do fall within the second money laundering provision under which Davis was charged, § 1956(a)(1)(B)(i). The conversion of cash into goods and services as a way of concealing or disguising the wellspring of the cash is a central concern of the money laundering statute. This is not to say that "the money laundering statute should be interpreted to broadly encompass all transactions, however ordinary on their face, which involve the proceeds of unlawful activity." *Sanders*, 928 F.2d at 946. To convict under § 1956(a)(1)(B)(i) the government must prove not just that the defendant spent ill-gotten gains, but that the expenditures

were designed to hide the provenance of the funds involved.

We believe that the government met this burden. Davis chose to place the proceeds of his drug sales not in a personal bank account but in bank accounts ostensibly maintained by the 15th Street Baptist Church and the 15th Street Baptist Church Development Corporation. He nevertheless treated the funds in these accounts as his own, using them to pay for cellular telephones he installed in his many cars and vans, his rent, and his credit card and home phone bills. Tr. 218–222. The jury could reasonably infer that the use of the church accounts was an attempt to hide the ownership and source of Davis' drug money while preserving his ready access to the funds in the accounts, which were as close as the church's checkbook. Moreover, the evidence also established that Davis frequently removed himself still further from the funds in the church accounts by using the church secretary to present Development Corporation checks made out to cash at Illini Federal. She would then hand over cash she received to Davis. Tr. 219–220. A rational juror could certainly conclude that these maneuvers were designed to conceal the source of Davis' ample store of tainted cash, bringing Davis squarely within the ambit of § 1956(a)(1)(B)(i). That the deception was ultimately unsuccessful, and even that it was relatively easy for investigators to pierce, does not mean that it falls beyond the statute's reach. *See Sutera*, 933 F.2d at 648 ("[T]he money laundering statute does not require the jury to find that Sutera did a good job of laundering the proceeds.").

■■ Because the money laundering statute is a relatively recent addition to the government's arsenal, and because this case raises unsettling questions about the breadth of its application, we pause to note that the government in its indictment, and the district court in its jury instructions, erroneously read the statute as requiring the government to prove that the transactions charged were both intended to promote Davis' continuing criminal enterprise under § 1956(a)(1)(A)(i), and were designed to conceal the source of the funds used in the transactions under § 1956(a)(1)(B)(i). The statute, however, only requires proof of one *or* the other. The fact that the government imposed an additional burden on itself does not warrant a reversal. *Cf. United States v. Townsend*, 924 F.2d 1385, 1413 (7th Cir.1991) ("It is only when the jury is instructed that its verdict may rest on any single ground alleged in a charge that, after a ground is invalidated, we cannot discern whether the verdict is based on an invalid ground."). That being said, we are unable to agree with the jury's apparent conclusion that the checks to cellular telephone providers, to Davis' landlord, and to cash, promoted his ongoing sales of crack in any direct way.

■ The error in the indictment and the jury charge does point to another question, however, namely the relationship between § 1956(a)(1)(A)(i) and (a)(1)(B)(i). These two provisions are aimed at different activities, the first at the practice of plowing back proceeds of "specified unlawful activity" to promote that activity, the second at hiding the proceeds of the activity. The different aims suggest that the prosecution in a money laundering case will generally make its case under one provision or the other; only in the unusual case will the government be able to prove that a single transaction was intended to both promote an illegal activity *and* conceal the origin of the funds used in that activity. This suggests that the government should advise the district court and defense counsel whether it is proceeding under the former, the latter, or both, and that the jury be charged accordingly. The potential breadth of the statute, and the risk that juries will confuse money laundering with money spending, *see United States v. Sanders*, 928 F.2d 940, 946 (10th Cir.1991), persuades us that their inquiry should be channelled by more specific instructions than the one given in this case.

IV. SUFFICIENCY OF THE EVIDENCE—CONSPIRACY TO DISTRIBUTE COCAINE (DAVIS, GINES)

Davis and Gines join in challenging their convictions under count two of the com-

plaint, which charged them with conspiring to distribute more than 50 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 846. Davis points to various inconsistencies in the testimony of the witnesses who appeared on the government's behalf at trial as well as the fact that the only people who testified that they had witnessed Davis participate in drug activities were themselves under arrest for drug activities. Gines alleges that there was no evidence linking him to the conspiracy for the entire period identified in the indictment or to the amount of drugs which the conspiracy was charged with distributing.

■■■ We have already noted the standard we apply in reviewing challenges to the sufficiency of the evidence supporting jury verdicts. *Ante at* 840. "To prove that a defendant was a member of a conspiracy the government must present sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose." *United States v. Auerbach,* 913 F.2d 407, 414–15 (7th Cir.1990); *see United States v. Townsend,* 924 F.2d 1385, 1390 (7th Cir. 1991); *United States v. Durrive,* 902 F.2d 1221, 1225 (7th Cir.1990); *United States v. Mealy,* 851 F.2d 890, 897 (7th Cir.1988). "In meeting its burden of proof, the government may use circumstantial evidence, and, in fact, such evidence 'may be the sole support for a conviction.'" *Durrive,* 902 F.2d at 1225 (quoting *United States v. Nesbitt,* 852 F.2d 1502, 1511 (7th Cir.1988), *cert. denied,* 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989)); *see Townsend,* 924 F.2d at 1391; *United States v. Cea,* 914 F.2d 881, 886 (7th Cir. 1990).

■■ Turning to Davis' challenge first, he essentially argues that many of the witnesses who testified for the government presented testimony that was so biased and inconsistent that no reasonable juror could convict based upon it. Absent unusual circumstances, we are not free to reassess the credibility of the witnesses who appeared on the government's behalf at trial in light of their checkered pasts or their biases.

The jury decides they are credible when it chooses to convict. *See United States v. Ruiz,* 932 F.2d 1174, 1178 (7th Cir.1991); *United States v. Klein,* 910 F.2d 1533, 1538 (7th Cir.1990); *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989); *United States v. DeCorte,* 851 F.2d 948, 952 (7th Cir.1988).

■■ Accepting that the testimony of the witnesses who testified against Davis was true, there was certainly enough of it for reasonable jurors to conclude that he entered an agreement with others to, and did, distribute crack cocaine. Kimberly Smith, a resident of 1479 Belmont, testified that Davis would frequently visit the house to bring Jackson cocaine, which Jackson would then distribute to her to sell. Tr. at 275–280. When asked to describe the relationship between Davis and Jackson, Smith replied, "Mandell Jackson worked for Reverend Davis selling his cocaine." Tr. at 280. Keith Flakes also lived at 1479 Belmont, and he testified that Davis "was the one that used to bring large quantities that we used to sell and pick up cash and stuff like that." Tr. at 312. He also testified that operations at 1479 Belmont were directed by Jackson and Gines, and that after he had finished making street sales, he would hand over the money he had received to the two of them. Tr. at 318. Marcie Rupert testified that Davis told Jackson to add Marcie to the sales force that operated out of the Belmont Avenue house, Tr. at 357, and that she would give money to Jackson who would then turn it over to Davis. Tr. at 378. We think that this testimony, which is only the tip of the iceberg, suffices to establish that reasonable jurors could find that Davis was guilty of joining the conspiracy charged in count two.

■■■ Gines' challenge to the sufficiency of the evidence on the conspiracy count is that the government failed to establish beyond a reasonable doubt that he was a member of the conspiracy for the entire period identified in the indictment, October 1987 to April 1989, or that he conspired to participate in sales of more than 50 grams of cocaine base, the amount

which the conspirators are charged with distributing. As to the first of these propositions, it is well settled that "[t]he time period of a conspiracy is determined not by the dates alleged in the indictment, but by the evidence adduced at trial." *United States v. Guzman*, 852 F.2d 1117, 1121 (9th Cir.1988); *see also United States v. Davis*, 679 F.2d 845, 852 (11th Cir.1982), *cert. denied*, 459 U.S. 1207, 103 S.Ct. 1198, 75 L.Ed.2d 441 (1983) (time not an essential element of a conspiracy indictment "so long as the time frame proved was within the period alleged in the indictment."). A claim that the evidence was insufficient to prove that a defendant was a member of a conspiracy for the entire period charged in the indictment is in truth a claim that the evidence at trial varied from the allegations of the indictment. *Cf. Townsend*, 924 F.2d at 1385 (noting relationship between variance challenge and sufficiency challenge). Particularly in a conspiracy case, a defendant must show more than that a variance existed between the time period charged in the indictment and the time period shown by the facts which emerged at trial. He must also show that he was prejudiced by the variance. *See id.*, 924 F.2d at 1390; *United States v. Bruun*, 809 F.2d 397, 406 (7th Cir.1987); Fed.R.Crim.Pro. 52(a) ("Any ... variance which does not affect substantial rights shall be disregarded.").

■■ In this case, Gines cannot plausibly claim that he was prejudiced by the variance. The total time period charged in the indictment was the nineteen months between October 1987 and April 1989. Though the government's witnesses did not always identify precisely when particular events occurred, the evidence did show Gines' involvement with the conspiracy over a period contained within the period charged. For example, Gines was involved in a sale to an undercover police officer who drove up to the Belmont Avenue house on December 22, 1988. Tr. at 250. During the search for the runaway child the same day, Gines told the police that he worked for Jackson. Tr. at 531. Keith Flakes was introduced to Davis in the Summer of 1988 by Mandell Jackson. Tr. at 324. He stopped dealing drugs when he was arrest-

ed in October 1988. Tr. at 320–21. During this period of a few months he was repeatedly directed by Gines to pick up cocaine at the Wabashaw house when the Belmont house would run short. Tr. at 319. This evidence, particularly taken together with the numerous witnesses who placed Gines at the Belmont house during their stays there, is sufficient to establish that Gines participated in the conspiracy during at least the latter half of 1988. Gines was arrested in January 1989, curtailing his contribution to the conspiracy. Given Gines' participation for a substantial portion of the period charged in the indictment, it is safe to say that he was not prejudiced by the variance between this period and the longer period charged by the government.

■■ Gines' second argument is that the government failed to prove that he personally participated in the sale of 50 or more grams of cocaine base as charged in the indictment. The short answer to this claim is that the government need not prove that an individual defendant played a role in all the activities of a conspiracy to be charged with conspiring with others to promote those activities. Rather, "to be a member of a conspiracy, a person does not need to know or participate in every detail of the conspiracy, or to know all the conspiracy's members." *United States v. Sophie*, 900 F.2d 1064, 1081 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 124, 112 L.Ed.2d 92 (1990). As we wrote in *Townsend*, "[t]o join a conspiracy [ ] is to join an agreement...." 924 F.2d at 1390. Where that agreement includes the distribution of large quantities of narcotics, it is no defense to a conspiracy charge for a party to the agreement to argue that he was personally involved in the distribution of a smaller amount. The only defense is to show that the evidence at trial failed to establish that the conspiracy as a whole distributed the amount stated in the indictment.

■ In this case, that argument is woefully deficient. The testimony at trial established that the agreement Gines joined

was intended to, and did, distribute an amount of cocaine base far in excess of 50 grams. Keith Flakes testified that the Belmont house took in two to three thousand dollars a day. Tr. at 327–28. At prices of $100 for a sixteenth of an ounce of cocaine, this would represent the sale of over an ounce (slightly more than 28 grams) a day. Dwayne Scruggs, who described the Wabashaw house as being "like a McDonald's," Tr. at 423, testified that he sold approximately 150 "sixteenths," pieces of crack weighing one-sixteenth of an ounce and costing $100, in an average 24–hour period. Taken together, these figures suggest that the conspiracy's sales exceeded 50 grams in a day, let alone in the 19 months charged in the indictment or even the shorter period during which Gines was a member of the conspiracy.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL (DAVIS)

Davis' next argument is that he was deprived of his Sixth Amendment right to counsel when his trial counsel afforded him ineffective assistance. In his main brief, Davis presents a cursory argument which sets out the standard we apply to ineffective assistance claims but fails to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). The defendant asserting an ineffectiveness claim "bears the burden of proving both incompetence and prejudice." *United States v. Mealy*, 851 F.2d 890, 908 (7th Cir.1988). One prerequisite to proving incompetence is that the defendant identify evidence supporting his claim that his trial counsel's performance dropped below the constitutional minimum. *See, e.g., United States v. Andiarena*, 823 F.2d 673, 678 (1st Cir.1987); *United States v. Rogers*, 769 F.2d 1418, 1424 (9th Cir.1985); *United States v. Curtis*, 742 F.2d 1070, 1073 (7th Cir.1984) (*per curiam*), *cert. denied*, 475 U.S. 1064, 106 S.Ct. 1374, 89 L.Ed.2d 600 (1986). The ineffectiveness argument Davis makes in his main brief on appeal fails to point us to this evidence, opting

instead for the conclusory statement that "had the defendant's counsel performed in a competent manner, the jury would certainly have acquitted him of all charges." Brief at 15.

Davis does better in a *pro se* supplemental brief, arguing that his trial counsel failed to interview certain witnesses who would have testified concerning Davis' sources of legitimate income from car sales, demolition contracts, and other legitimate activities. This evidence, Davis argues, would have helped rebut the inference that the money kept in the Illini Federal accounts was derived from drug sales. As we have previously observed, "[e]ffective representation of a criminal defendant requires pretrial preparation and investigation." *United States v. Weaver*, 882 F.2d 1128, 1138 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 415, 107 L.Ed.2d 380 (1989); *see United States v. Berkowitz*, 927 F.2d 1376, 1382 (7th Cir.1991); *Montgomery v. Petersen*, 846 F.2d 407, 412–13 (7th Cir. 1988); *Crisp v. Duckworth*, 743 F.2d 580, 583 (7th Cir.1984), *cert. denied*, 469 U.S. 1226, 105 S.Ct. 1221, 84 L.Ed.2d 361 (1985). "[A]pplying a heavy measure of deference to counsel's judgment," *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2064, however, we are unable to conclude that the performance of Davis' trial counsel "fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2066, when he failed to dig as deeply as he could have into Davis' legitimate sources of income.

We reach this conclusion because much of the evidence Davis accuses his trial counsel of failing to uncover either reached the jury anyway or was cumulative of evidence that did. IRS Agent Wehrheim testified concerning summaries he had prepared of Davis' legitimate sources of income, summaries which included the largest single source of legitimate income the Development Corporation had, a demolition contract to tear down a building in East St. Louis. Tr. at 668. Davis himself testified concerning his various legitimate sources of income, including income from the people he now accuses his counsel of failing to interview. *See, e.g.*, Tr. at 880–881 (demoli-

tion contract with Dennis Fults); Tr. at 862 (bird-dog fees from Triple A Auto Salvage). With or without his lawyer's investigation, the jury was able to hear the evidence favorable to Davis that the investigation would have revealed. It is not ineffective assistance for defense counsel to make a tactical decision not to pursue a course of investigation that would produce evidence that the counsel otherwise is aware of or that would add little to otherwise available information. *See Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir.1986) (failure to interview potential defense witness not ineffective assistance where counsel had other sources of knowledge as to what witness would have said); *Jones v. Smith*, 772 F.2d 668, 674 (11th Cir.1985), *cert. denied*, 474 U.S. 1073, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986) (not ineffective assistance of counsel to fail to present expert to testify as to unreliability of eyewitness testimony where likelihood of misidentification was fully explored on cross-examination); *United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir.1984), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985) (not ineffective assistance to fail to interview defense witnesses where testimony would have been cumulative of that presented by witnesses who did testify at trial). As Judge Leventhal wrote in *United States v. DeCoster*, 624 F.2d 196, 209 (D.C.Cir.1976) (*en banc*) (plurality opinion), *cert. denied*, 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 311 (1979), "[a] claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel."

## VI. PROSECUTORIAL MISCONDUCT (DAVIS)

Davis moves on to argue that the prosecutor who tried his case engaged in misconduct by deterring a defense witness from testifying on his behalf. The witness was Sam Bennett, a vice president at a St. Louis bank which made purchase-money loans to Davis' parishioners and others Davis referred to him. According to Davis, Bennett would have testified that he allowed Davis to co-sign these loans when they were made to individuals Davis sent to see him. Bennett's testimony, Davis alleges, would have established that these loans represented a substantial source of deposits into the bank accounts at issue in the money laundering counts, defeating the inference that these funds were derived from drug sales. When Bennett arrived at the courthouse to testify, he was ushered into the judge's chambers, where the three defense lawyers, the prosecutor, and the trial judge were waiting. After Bennett was sworn, the prosecutor advised him that he was the target of an ongoing federal investigation into bank fraud. The prosecutor told Bennett—who was not accompanied by counsel—that the questions he would be asked might touch upon the subject of that investigation, and advised him that any testimony he gave in Davis' trial could be used against him later. Bennett chose not to testify, and Davis did not, so far as the record reflects, seek to have him subpoenaed.

On appeal, Davis argues that the prosecutor intimidated Bennett into silence, depriving Davis of helpful testimony in violation of his "right to present his own witnesses to establish a defense" which is "a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967); *see also Webb v. Texas*, 409 U.S. 95, 98, 93 S.Ct. 351, 353, 34 L.Ed.2d 330 (*per curiam*) (trial judge's threatening remarks to defense witness violated defendant's right to due process). The government responds that Bennett was not intimidated, but was merely advised of the ongoing investigation and allowed to reconsider his decision to testify in light of that inquiry.

Situations like Mr. Bennett's appearance at the courthouse call upon prosecutors to walk a narrow path. On the one hand, *Webb* cautions that "[s]ubstantial government interference with a defense witness' free and unhampered choice to testify violates due process." *United States v. Goodwin*, 625 F.2d 693, 703 (5th Cir.1980); *see also United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C.Cir.1982) ("The consti-

tutional right of a criminal defendant to call witnesses in his defense mandates that they be free to testify without fear of governmental retaliation."). On the other hand, ethical duties require prosecutors to warn unrepresented witnesses of the risk that the testimony they are about to give may be used against them. *See United States v. Pinto,* 850 F.2d 927, 934 & n. 1 (2d Cir.), *cert.. denied,* 488 U.S. 867, 932, 109 S.Ct. 174, 323, 102 L.Ed.2d 143, 341 (1988) (ABA Standards for the Administration of Criminal Justice § 3–3.2(b) requires prosecutor to " 'advise the witness concerning possible self-incrimination and the possible need for counsel.' ").

██ A prosecutor faced with the prospect of an unrepresented defense witness who may be asked to provide self-incriminating testimony can do no more than to advise the witness of the risks he may bring upon himself, presenting this advice in a manner calculated to engender informed and uncoerced decisionmaking on the part of the witness. Where the prosecutor simply provides the witness with a truthful warning, no constitutional violation occurs. *Blackwell,* 694 F.2d at 1335 (D.C.Cir.1982). Where, however, the substance of what the prosecutor communicates to the witness is "a threat over and above what the record indicate[s] was timely, necessary, and appropriate," the inference that the prosecutor sought to coerce a witness into silence is strong. *United States v. Simmons,* 670 F.2d 365, 369 (D.C. Cir.1982).

██ We believe that the prosecutor's communication with Bennett in this case were closer to a truthful warning than to the "highly intimidating" statements, *United States v. Morrison,* 535 F.2d 223, 227 (3d Cir.1976), "excessive in number and badgering in tone or phrasing," *United States v. Silverstein,* 732 F.2d 1338, 1345 (7th Cir.1984), *cert. denied,* 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985), and "obviously threatening," *Simmons,* 670 F.2d at 368, that past cases have identified as so coercive as to raise constitutional concerns. The encounter took place in the presence of the district judge as well as all counsel, a setting which limited the potential for threats and overreaching intended to deter Mr. Bennett from testifying. The prosecutor's statements for the most part simply presented Bennett with the facts, informing him that he was the target of an ongoing federal fraud investigation and warning him that it was possible that he would be asked questions that would concern the subject of that investigation. Tr. at 797–98. It is true that certain of the prosecutor's statements might better have been left unsaid, such as the warning to Bennett that if he testified the prosecutor would make sure that the FBI officers investigating the possible fraud at Bennett's bank were present in the courtroom. Tr. at 798. This statement, however, like other similar statements, were objected to by defense counsel and were addressed by the district court, which stepped in to present a more dispassionate and detached view of the risks Bennett might bring upon himself by testifying. Viewing the encounter as a whole we cannot say that Bennett was "preclude[d] ... from making a free and voluntary choice whether or not to testify." *Webb,* 409 U.S. at 98, 93 S.Ct. at 353.

## VII. SENTENCING (JACKSON)

██ Mandell Jackson challenges the district court's determination that he was a manager in a drug conspiracy which involved five or more participants. This finding increased Davis' offense level by three levels, *see* U.S.S.G. § 3B1.1(b), leading to a total score of 37 and a sentencing range of 210 to 262 months. Jackson argues that there was no evidence supporting the district court's conclusion that he was a manager as that term is explained in the Guidelines. Jackson describes himself instead as one of a number of people who took orders from Davis, and contends that he did not supervise others who were involved in Davis' business.

"A sentencing court's determination concerning a defendant's role in the offense is a finding of fact, subject to a clearly erroneous standard of review on appeal." *United States v. Brown,* 900 F.2d 1098,

1101 (7th Cir.1990); *see, e.g., United States v. Feekes*, 929 F.2d 334, 338 (7th Cir.1991); *United States v. Spillman*, 924 F.2d 721, 723 (7th Cir.1991). The government bears the burden of proving that Jackson was a manager, but it may satisfy this burden by establishing that the preponderance of the evidence supports this conclusion. *Spillman*, 924 F.2d at 723; *United States v. Beaulieu*, 893 F.2d 1177, 1181 & n. 7 (10th Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990). In this case it has more than met its burden. The evidence at trial clearly established that Jackson played a role in Davis' drug operation distinct from that of the numerous other hapless individuals who occupied the Belmont house and were the conspiracy's foot-soldiers. Ernest Jones testified that Davis would frequently hand Jackson cocaine in exchange for money. Tr. at 140. Kimberly Smith testified that it was Jackson who distributed guns to the street dealers, Tr. at 283, and who was one of only three people she ever saw cook cocaine at the Belmont house, the others being Davis and Gines. Tr. at 288. Like Jones, she frequently saw Jackson transfer money to Davis. *Id.* Keith Flakes testified that after he made sales, he gave the money to Jackson. Tr. at 318. He also described Jackson as directing the work of the numerous street-dealers who operated out of the Belmont house. Tr. at 315. This view of Jackson's role in Davis' operations was joined by Dwayne Scruggs, Tr. at 412, himself the manager of the Wabashaw house. This testimony establishes that Jackson supervised the Belmont house, both preparing cocaine for sale and collecting the proceeds from the sellers to be transferred to Davis. It also establishes that the district court did not err in finding that a preponderance of the evidence established that Jackson "participa[ted] in planning and organizing the offense," U.S.S.G. § 3B1.1, Application Note 3, to a far greater degree than others at the Belmont house.

## VIII. SENTENCING (GINES)

Romano Gines also challenges an enhancement to his sentence. The district court increased the offense level used to calculate Gines' sentencing range by two points based on a finding that Gines had obstructed justice, *see* U.S.S.G. § 3C1.1, by giving a false statement to law enforcement officials during an abortive effort at cooperation with the government's investigation of Davis' drug activities. The facts underlying the enhancement were that in January 1989 Gines spoke with state and federal investigators concerning the narcotics conspiracy. After being sworn he gave a statement extensively describing his activities at the Belmont house, and identifying Jackson as the person who directed its affairs and Davis as someone who visited the house four or five times a day. Gines Sentencing Transcript at 34. Gines also stated that his knowledge of Davis' role was incomplete because Jackson and Davis excluded him from many of their conversations. *Id.* at 56. In May 1989, after Gines had been arrested on state drug charges and Davis and Jackson had been arrested on federal charges, Gines wrote a letter to the United States Attorney's office offering a fuller account of Davis' involvement in narcotics activities. The government argued at Gines' sentencing hearing that in the January interview Gines had withheld information from them about Davis' involvement in the drug sales made from the Belmont house, information he later revealed in his May letter. The district court, while noting a "concern" about the government's request, nevertheless found that the incompleteness of Gines' January statements warranted the imposition of a two-level enhancement for obstruction.

On appeal, Gines argues that he responded truthfully to the questions put to him during the January interview, but that, as the evidence at trial established, his direct contacts with Davis were limited. He contends that he gave the government all the information they asked him for, but that what they asked him for was less than all he knew. The government argues that Gines concealed information, and that it "expended resources by using information provided by Gines for investigative purposes, only to find that Gines' information was misleading." Brief at 27.

Section 3C1.1 of the Guidelines provides: "If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase by 2 levels." Both the plain language of the guideline and the 1990 amendments to the application notes that follow it suggest that the enhancement is not to be applied indiscriminately to any conduct that in any way hampers the investigation of a crime, but rather only to *willful* conduct that has a *significant* impact on the administration of justice. *See* § 3C1.1 Application Note 2 (1990) (distinguishing between "types of conduct to which this enhancement is intended to apply" and "less serious forms of conduct to which this enhancement is not intended to apply, but that ordinarily can appropriately be sanctioned by the determination of the particular sentence within the otherwise applicable guidelines range."). The 1990 amendment to the application note most pertinent to the conduct at issue in this case also speaks to the degree of obstruction that the government must establish before a district court applies the enhancement. It states that the enhancement is appropriate where the defendant "provid[ed] a *materially* false statement to a law enforcement officer that *significantly* obstructed or impeded the official investigation or prosecution of the instant offense." U.S.S.G. § 3C1.1, Application Note (3)(g) (emphasis added).

 As with the various role-in-the-offense enhancements provided for in U.S. S.G. § 3B1.1, obstruction of justice enhancements under § 3C1.1 are reviewed under a clearly erroneous standard. *Feekes*, 929 F.2d at 338; *United States v. Teta*, 918 F.2d 1329, 1333 (7th Cir.1990); *United States v. Wheelwright*, 918 F.2d 226, 229 (1st Cir.1990); *Brown*, 900 F.2d at 1103. In this case, we are compelled to conclude that the district court clearly erred when it found that the government had established that Gines willfully provided a materially false statement that significantly hampered the government's investigation of Davis' activities.

First, we note that the government has not pointed to a single false statement made in Gines' January statement. Indeed, the recapitulation of his statement contained in the record, *see* Gines Sentencing Transcript at 54–56, suggests that he provided the government with a great deal of truthful information concerning the drug activities based in the Belmont house and the roles Davis and Jackson played in these activities, information corroborated by the witnesses who testified at trial. Rather, the government contends that Gines held back on it by failing to disclose all he knew about Davis' involvement in these operations. It is true that the May letter revealed more about Davis than did the January interview, but this perhaps says more about the depth of the government's questioning of Gines in January, at a relatively early stage of the investigation, than it does about any willful failure on his part to provide information about which the government inquired. Cooperating witnesses like Gines who have themselves been parties to a crime and are part of a larger conspiracy will typically be hesitant to reveal all they know, for reasons that range from a fear of retribution to a desire to keep the government interested in helping them by telling their story in bits and pieces. They do not necessarily obstruct justice by failing to divulge all they know early in their first encounter with investigators. The record here indicates no more than that Gines did not tell all he knew about Davis' role because he was not asked to. At least there is nothing in the district court's brief finding or in the record on appeal to suggest otherwise.

Second, assuming *arguendo* that Gines did willfully underplay Davis' involvement, we question whether the government could establish that Gines' failure to tell all "significantly obstructed or impeded" efforts to bring the conduct of Davis' drug business to a speedy end as required under the application notes to § 3C1.1 as they now read, though not as they read when Gines was sentenced. Gines told the government that Davis would visit the Belmont house four or five times a day and confer with Jackson in a closed room to which Gines

## 850

was not allowed entry. He also provided numerous other details concerning the cooking of powder cocaine into crack and the sale of crack by the network of street dealers. This information, together with what the government had previously learned from other cooperating witnesses such as Marcie Rupert, pointed them to Davis and Jackson. That Gines was something less than a motherlode of information does not establish that he impeded the investigation. Certainly he did nothing to throw the police off the scent of Davis' activities; the government's brief statement that it "expended resources ... only to find out that Gines' information was misleading" does not itself suffice to establish that Gines hampered the investigation in any significant way.

### IX. CONCLUSION

We have reviewed the remaining arguments made by defendants and find them to be without merit. For the foregoing reasons, the convictions of Davis, Gines, and Jackson are affirmed. We remand to the district court so that it may resentence Gines.