

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-7-2001

# United States v. Omoruyi

Precedential or Non-Precedential:

Docket 00-4330

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"United States v. Omoruyi" (2001). *2001 Decisions.* Paper 175.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/175

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 7, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-4330

UNITED STATES OF AMERICA

v.

AUSTIN O. OMORUYI,
a/k/a
Charles Oloro
a/k/a
Bobby Pierce

      Austin O. Omoruyi,

      Appellant

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(Criminal No. 00-00103-1)
District Judge: Honorable Sylvia H. Rambo

Argued July 11, 2001

BEFORE: SLOVITER, ALITO, and GREENBERG,
Circuit Judges

(Filed: August 7, 2001)

      James V. Wade
      Federal Public Defender
      Thomas A. Thornton (argued)
      Assistant Federal Public Defender
      100 Chestnut Street, Suite 306
      Harrisburg, PA 17101

      Attorneys for Appellant

David M. Barasch
United States Attorney
Kim Douglas Daniel
Assistant United States Attorney
Theodore B. Smith (argued)
Assistant United States Attorney
P.O. Box 11754
Harrisburg, PA 17108

   Attorneys for Appellee

OPINION OF THE COURT

GREENBERG, Circuit Judge.

This matter comes on before this court on Austin O. Omoruyi's appeal from a final judgment of conviction and sentence entered on December 12, 2000, on a 14-count indictment charging him with mail fraud affecting a financial institution and money laundering. Omoruyi pled guilty to the mail fraud counts and does not challenge his conviction or sentence on those counts. Rather, he limits his challenge to his conviction and sentence for money laundering, arguing that the evidence was insufficient to establish that he had committed that crime or, alternatively, that the district court erred by applying the money laundering rather than the fraud sentencing guidelines in calculating his sentence. Because we find that neither of Omoruyi's contentions has merit, we will affirm his conviction and sentence in all respects.

I. BACKGROUND

In February 1999, a person not known to the authorities stole seven blank "convenience checks" attached to the bottom of First USA credit card statements from the mail in Texas. Later, in April 1999, a similarly unknown person stole three blank American Express convenience checks from the mail in New York.

In approximately March and April 1999, Omoruyi opened three savings accounts at banks in the Middle District of

2

Pennsylvania in the names of "Charles Oloro" or "Robert Pierce." Thereafter, all ten of the stolen checks were made payable to Pierce or Oloro in amounts varying between $5,100 and $9,890, and deposited in the savings accounts, nine via the mail and the tenth at a teller's window.1 Later, on May 6, 1999, a counterfeit commercial check drawn against a law firm's account at a New York City bank was mailed to one of the banks for deposit, but the bank never credited the account for the proceeds of the check because it was suspicious of the transaction.

After the banks credited the accounts with the deposits, Omoruyi began withdrawing funds from the accounts via automatic teller machine ("ATM") and teller window withdrawals.2 Most of the ATM withdrawals took place in New York and New Jersey, while most of the teller window withdrawals took place in Pennsylvania.

Ultimately, postal inspectors determined that Omoruyi was "Robert Pierce" and "Charles Oloro." Accordingly, they established a surveillance on a Brooklyn mail drop Omoruyi had opened. When Omoruyi arrived at the mail drop on June 1, 1999, the inspectors arrested him.

Following Omoruyi's arrest, the government first held him for prosecution in the United States District Court for the Southern District of New York on the charge of making his third illegal entry into the United States. On February 2, 2000, based on a conviction predicated on his plea of guilty, that court sentenced him to 51 months incarceration. Meanwhile, on July 21, 1999, postal inspectors filed a complaint in the Middle District of Pennsylvania charging Omoruyi with mail fraud. On March 29, 2000, a grand jury returned a 14-count indictment, charging Omoruyi with six counts of mail fraud affecting a financial institution and eight counts of money laundering. The six counts of mail fraud stemmed from the mailing of

_____

1. The Government states the deposits totaled $77,626, while Omoruyi states the total deposits were $80,424. The discrepancy is not material to our disposition of this case.

2. Omoruyi admits he withdrew $33,900 from these accounts, while the Government contends he withdrew almost $70,000. The parties do not suggest that the discrepancy is material here.

the counterfeit check as well as five of the ten checks to banks in the Harrisburg area. The money laundering counts were based on eight teller window withdrawals by Omoruyi, utilizing false identification, at Harrisburg-area banks.

On June 8, 2000, Omoruyi pled guilty to the mail fraud counts and submitted to a bench trial on the money laundering counts. The trial was premised almost entirely upon stipulated testimony and exhibits establishing that Omoruyi "opened [three] savings accounts and withdrew funds using the false names under which the savings accounts were established." Appellant's Br. at 6. After the court took the matter under advisement, on June 19, 2000, it found Omoruyi guilty on all eight money laundering counts.

On December 11, 2000, the court sentenced Omoruyi to 63 months incarceration on each mail fraud and money laundering count followed by three years of supervised release on each of these counts, and required him to pay $1,400 in special assessments and restitution in the amount of $31,209. The court ordered that the sentences run concurrently with each other as well as concurrently with Omoruyi's 51-month sentence imposed in the Southern District of New York. Thereafter, Omoruyi timely appealed to this court.

II. DISCUSSION

The district court had original jurisdiction over offenses against the United States pursuant to 18 U.S.C.S 3231. We have jurisdiction over an appeal of a final decision by a district court pursuant to 28 U.S.C. S 1291 and over an appeal of a final sentence in a criminal case pursuant to 18 U.S.C. S 3742(a).

A. Validity of the Money Laundering Conviction

Omoruyi contends first that there was insufficient evidence to establish the elements of money laundering because he did not conduct a financial transaction with "proceeds" of the mail fraud. He argues that the mail fraud was not complete, and therefore did not yield "proceeds"

4

until he took possession of the cash credited to the accounts. Thus, in his view, the cash withdrawals could not serve as the basis for the money laundering counts. On this point, to the extent that the appeal involves legal determinations we exercise plenary review, but when the sufficiency of the evidence is challenged, we review the record to determine if there was substantial evidence to support the verdict. See United States v. Conley , 37 F.3d 970, 975 (3d Cir. 1994); United States v. Pungitore, 910 F.2d 1084, 1129 (3d Cir. 1990).3

On this appeal, we are concerned with the construction of 18 U.S.C. S 1956(a)(1) which defines illegal money laundering as:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity--
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
>
> . . .
>
> (B) knowing that the transaction is designed in whole or in part --
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . .

Accordingly, section 1956(a)(1) sets forth the four elements of a money laundering offense: (1) an actual or attempted financial transaction; (2) involving the proceeds of specified unlawful activity; (3) knowledge that the transaction involves the proceeds of some unlawful activity; and (4) either an intent to promote the carrying on of specified unlawful activity or knowledge that the transactions were designed in whole or in part to conceal the nature, location, source, ownership, or control of the proceeds of specified

_____

3. In fact, the principles applicable to the validity of the conviction are
essentially legal in character.

5

unlawful activity.4 See id. ; see also United States v. Morelli, 169 F.3d 798, 803 (3d Cir.), cert. denied, 528 U.S. 820, 120 S.Ct. 63 (1999).

In Conley, 37 F.3d at 978, we considered whether the deposit of illegal gambling proceeds could support a conviction for the money laundering object of a conspiracy. There the defendant argued that the government failed to establish the essential elements of money laundering because the conduct upon which the government based the charge was essentially the same as that supporting the illegal gambling charges. See id. We explained the defendant's contention as follows:

> McGrath contends before us that a wide variety of transactions involving the money placed into the video poker machines is necessarily part of the illegal gambling business, including collecting and counting money, dividing up money, transferring and transporting money, depositing money into banks and withdrawing money from banks. McGrath contends that this same conduct cannot be properly alleged to be money laundering.

Id. We disagreed with the defendant's contentions. See id. at 978-79. In doing so, we acknowledged that "[o]bviously, whenever a defendant makes money from criminal activity he has something to do with it," and that "Congress did not enact money laundering statutes simply to add to the penalties for various crimes in which defendants make money." Id. at 979. But, we found that section 1956(a)(1) addressed this concern, and therefore delineated clearly between the underlying offense and the money laundering offense, by including an intent requirement. See id. We stated:

> Section 1956(a)(1), quite clearly, does not prohibit all financial transactions that are conducted with the proceeds of specified unlawful activity. It only proscribes those transactions that are conducted with the intent to promote certain further illegal activity, under subsection (A), or that are designed to conceal under subsection (B).

_____

4. Omoruyi does not appear to contest the first and third elements.

6

These requirements would preclude the application of
section 1956 to non-money laundering acts such as a
defendant's depositing the proceeds of unlawful activity
in a bank account in his own name and using the
money for personal purposes.

Id. (citing United States v. Jackson, 935 F.2d 832 (7th Cir.
1991)).

Furthermore, we indicated that for money to become
"proceeds" it must be derived from a completed offense, or
a completed phase of an ongoing offense. See id.  at 980.
That being said, the conduct constituting the underlying
offense conduct may overlap with the conduct constituting
money laundering. See id. To that end, we found that the
money, once collected from the various video poker
machines, became " `proceeds of specified unlawful
activity' " within the meaning of the money laundering
statute, even though there may have been some overlap in
the acts alleged to constitute the conduct of an illegal
gambling business and money laundering. Id. (quoting 18
U.S.C. S 1956(a)(1)).

Applying Conley here, it is clear that there was
substantial evidence supporting Omoruyi's money
laundering conviction. Omoruyi contends, in an argument
similar to that of the defendant in Conley, that the conduct
charged as money laundering was the same conduct
constituting mail fraud. Nevertheless, inasmuch as the
money was deposited in bank accounts under false names,
and Omoruyi used false identification to withdraw it, he
clearly conducted the transactions charged with the intent
to conceal or disguise the nature, source, ownership and
control of the proceeds of the mail fraud. As we noted in
Conley, section 1956 would not apply to a defendant's
depositing the proceeds of unlawful activity in a bank
account "in his own name" and using the money for
personal purposes, as neither the "promote" or"conceal"
aspects of the money laundering statute would be met. Id.
at 979 (emphasis added). Here, however, there is sufficient
evidence of concealment, and of Omoruyi's intent to
conceal, to sustain his conviction.

Moreover, Conley establishes that, at the very latest, the

money acquired through the mail fraud became "proceeds" at the time the checks were honored by the various banks. As we found in Conley, proceeds are derived from an already completed offense or a completed phase of an ongoing offense. See id. at 980. Here, the indictment charged six counts of mail fraud based on the mailing of fraudulently obtained checks to the various banks, while the money laundering counts were based upon eight subsequent teller window cash withdrawals. Therefore, the mail fraud offenses were complete as of the time the six checks were placed in the mail for delivery to the banks, and thus the money thereafter derived from the checks constituted the proceeds of the already completed offenses.[5]

Notwithstanding Conley, Omoruyi also argues, citing United States v. Johnson, 971 F.2d 562, 569-70 (10th Cir. 1992), that money cannot be "proceeds" until the defendant has possession of it. Relying on the fact that the money was in bank accounts under false names, he contends that he was not in possession of it until he actually withdrew it and therefore the money could not be deemed proceeds until that time.[6] He argues that "[t]he essential determination is when and how could possession of the funds be obtained," and because "the funds were never credited to an account

_____

5. The crime of mail fraud is defined as:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . .

18 U.S.C. S 1341. In fact, even if the mail fraud was not completed until the banks collected the proceeds, our result would not be altered as the mail fraud would have been completed before the cash withdrawals.

6. To this end, Omoruyi also relies on the court's statement in United States v. Edgmon, 952 F.2d 1206, 1209 (10th Cir. 1991), that "merely spending the proceeds of illegal activity does not violate the money laundering statute." As discussed previously, however, Omoruyi did not simply spend the proceeds of illegal activity. Rather, he engaged in a financial transaction designed to conceal the source, ownership and control of the proceeds.

8

under the name Austin Omoruyi," he could not be deemed to have possession over them until he had the cash. Appellant's Br. at 12.

In Johnson, however, the court found the defendant had possession over the money so that it constituted "proceeds" once the wire transfers at issue were credited to his account. See Johnson, 971 F.2d at 569-70. We recognize that the account in Johnson was under the defendant's name, while the accounts here were under false names, but this factual distinction is not of legal consequence in the resolution of this case. Although deposited under false names, the money was credited to accounts over which Omoruyi had control, and therefore the money was in his possession. His utilization of fictitious names and identification to access the accounts enhances, rather than detracts from the money laundering aspect of Omoruyi's conduct as he used these names and identification to conceal the source, ownership and control of the money. Accordingly, we find that there was substantial evidence supporting Omoruyi's convictions for money laundering which we thus affirm.[7]

B. Applicability of the Money Laundering Sentencing
       Guideline

Alternatively, Omoruyi contends that the district court erred in applying the money laundering sentencing guidelines, as opposed to the fraud guidelines, in calculating his sentence.[8] This point is important because if everything else with respect to sentencing is equal, the money laundering guidelines will yield a higher sentencing range than the fraud guidelines. Resolution of this issue requires us to consider preliminarily whether we should apply amended money laundering guidelines, effective on November 1, 2000, to Omoruyi's sentence as the court

_____

7. Moreover, Omoruyi contends that the government's action in prosecuting him for money laundering was "piling on" in violation of its own prosecution policies. We see no basis for this contention but in any event the policy, even if violated, does not create substantive rights entitling him to relief on this appeal. See Pungitore, 910 F.2d at 1120.

8. We review the district court's application of the sentencing guidelines de novo. See United States v. Bockius, 228 F.3d 305, 308 (3d Cir. 2000).

9

sentenced him on December 11, 2000, or whether we instead should apply the guidelines in effect at the time of his offense. In light of our recent decision in United States v. Diaz, 245 F.3d 294 (3d Cir. 2001), we conclude that ex post facto principles preclude the application of the amended guidelines here.

As a general rule, sentencing courts must apply the guidelines in effect at the time of sentencing. See United States v. Menon, 24 F.3d 550, 566 (3d Cir. 1994). However, where application of the guidelines in effect at sentencing would result in a more severe penalty than application of those in effect at the time of the offense, the court, to avoid an ex post facto violation, must apply the guidelines in effect at the time of the offense. See, e.g., United States v. Brannan, 74 F.3d 448, 450 n.2 (3d Cir. 1996); United States v. Cherry, 10 F.3d 1003, 1014 (3d Cir. 1993). Here, the conduct forming the basis of Omoruyi's conviction occurred between March and June 1999, well prior to the effective date of the amended guidelines, while he was sentenced on December 11, 2000, approximately one and one-half months afterwards. While the district court did not discuss the effect of the amendments to the guidelines and thus did not note the ex post facto problem we have identified, in fact it sentenced Omoruyi without applying the November 1, 2000 amendments.9 Nevertheless, unless the November 1, 2000 amendments made the penalty more severe we should apply them on this appeal and should take them into account when considering Omoruyi's appeal of his sentence. Therefore, we must consider in our sentencing discussion whether Omoruyi would be subject to a more severe penalty under the amended guidelines than under the guidelines in effect at the time of his offense.

_____

9. The presentence report indicated that the"sentencing guidelines effective November 1, 1998, were used in [its] calculations." The court, in
turn, indicated that it used the "factual findings and the guideline application in the presentence report" in imposing sentence with exceptions unrelated to the adoption of the November 1, 2000 amendments. In fact, we are not even certain whether the court or the parties at the time of the sentencing were aware of the November 1, 2000 amendments for, as Omoruyi points out, "[t]here was no discussion of the amendments at sentencing." Reply Br. at 7.

10

In Diaz, we considered whether the November 1, 2000 amendments to the sentencing guidelines should apply retroactively to the defendant's sentence. See Diaz, 245 F.3d at 296. Determination of this issue required us to consider whether the amended guidelines altered the law in effect at the time of the offense or merely clarified the law so that there was no substantive change between the dates of the offense and the sentencing. See id. at 301. After comparing the law prior to the amendments, namely our decision in United States v. Smith, 186 F.3d 290 (3d Cir. 1999), superseded by rule as stated in Diaz, 245 F.3d at 294, and the amended guidelines, we concluded that Smith, and its approach to applying the guidelines, is no longer "good law." See Diaz, 245 F.3d at 303. 10 In cases such as that here, in which several counts, including mail fraud and money laundering, have been grouped pursuant to U.S.S.G. S 3D1.2(b), the amendments make it mandatory for the sentencing court to apply the guideline carrying the highest applicable offense level. See id. Under the guidelines prior to the amendments, however, the sentencing court was to conduct a heartland analysis of the guidelines, determine whether the defendant's conduct is atypical of cases usually sentenced under that guideline and, if so, determine what guideline would be more appropriate under the circumstances. See id. at 301 (citing Smith, 186 F.3d at 297-98).

While it is true that the process that Smith required constituted a legal determination, see Smith, 186 F.3d at 297-98, still it introduced a degree of uncertainty into the selection of the applicable guidelines that the November 1, 2000 amendments eliminate. Thus, it is understandable that in Diaz we found that the amendments substantively changed the sentencing guidelines as interpreted by Smith and its progeny, and that application of the amended guidelines to a sentence issued prior to their effective date was precluded by ex post facto considerations. See Diaz, 245 F.3d at 305. Diaz clearly is controlling here.11

_____

10. Of course, we did not mean that Smith was not "good law" with respect to cases involving offenses committed prior to November 1, 2000.
11. In theory in Diaz we could have held that if under Smith the pre-November 1, 2000 money laundering guidelines were applicable then application of the amendments would be appropriate as there would not be an ex post facto problem. We did not, however, use this circular reasoning.

11

Accordingly, we will apply the pre-amendment guidelines, meaning the analysis established in Smith and its progeny, to this case and thus in this regard will use the same methodology in determining the applicable guidelines as the district court.12

Pursuant to Smith, we conduct a heartland analysis of the money laundering guidelines to determine whether the conduct being punished is "atypical" of the conduct usually sentenced under the guidelines. See Smith, 186 F.3d at 297. If so, then we are to determine what other guidelines would be more appropriate for sentencing. See id.

In Smith, the defendants were convicted of conspiracy to defraud, interstate transportation of stolen property, causing unlawful interstate transportation with intent to distribute stolen property, and money laundering. See id. at 296-97. The money laundering count was based on checks written by another defendant on the proceeds of kickbacks where the defendant ordered that many of these checks be written to his creditors, as opposed to directly to him. See id. The district court grouped the four offenses and applied the money laundering guideline. See id. at 292. On appeal, we vacated the defendants' sentences and remanded the case for resentencing under the fraud guideline. See id. at 300.

Applying the analysis described above, we found that the use of the money laundering guidelines was inappropriate. See id. We concluded that the defendants engaged in conduct inconsistent with concealment, such as leaving a paper trail, that any efforts at concealment were disingenuous, and that when considered with the entire course of conduct, the money laundering was an incidental by-product of the fraud. See id. Inasmuch as we deemed this conduct to be outside of the heartland of conduct intended to be punished by the money laundering statute, the money laundering guidelines did not apply. See id.

_____

12. In Hameen v. Delaware, 212 F.3d 226, 237-38 (3d Cir. 2000), cert. denied, 121 S.Ct. 1365 (2001), we recognized the principle that if a discretionary sentence becomes mandatory after the offense is committed there is a ex post facto violation. This principle is similar to that applied
in Diaz.

Since then, we have decided several cases applying the Smith analysis, the most relevant of which are United States v. Mustafa, 238 F.3d 485 (3d Cir. 2001), and Diaz. In Mustafa we held that the district court did not commit plain error in sentencing the defendant under the money laundering guidelines. See id. at 496. There, the defendant, while operating a supermarket, deposited more than $1.5 million worth of fraudulently obtained food stamps into his bank account. See id. at 487. In order for him to participate in the food stamp program, the government required the defendant to submit an application to the United States Department of Agriculture acknowledging that the bank account would be used to deposit food stamps obtained in accordance with governing law. See id. In addition, with each stamp deposit the defendant completed a required "redemption certificate" which purported to verify that the food stamps had been obtained legally. See id. Following the defendant's guilty plea to, among other things, 40 counts of money laundering, the district court utilized the money laundering guidelines and sentenced him to 135 months imprisonment. See id. at 488-89.

On appeal, we rejected the defendant's argument that the sentencing court improperly applied the money laundering guidelines because his conduct did not fall within the heartland of the money laundering statute, namely conduct involving the proceeds of large-scale drug trafficking and organized crime. See id. at 496. In doing so we found that the food stamp deposits were separate and distinct from the criminal activity from which they derived, namely the purchase of food stamps from persons involved in their illegal trafficking. See id. at 495. Further, with each deposit, the defendant represented that he had received the food stamps legitimately. See id. at 495-96. Therefore, his conduct was intended to create an appearance that the illegally obtained proceeds were themselves legitimate. See id. at 496. That the defendant had to deposit the food stamps for them to have any cash value was not determinative because he still intended to and was concealing the original source of the funds. See id. Accordingly, we affirmed the district court's application of the money laundering guidelines. See id.

13

We reached the opposite result, however, in Diaz . There, the defendant pled guilty to a four-count indictment charging her with, among other things, fraud and money laundering resulting from a scheme to obtain federal student financial assistance fraudulently on behalf of her cosmetology school. See Diaz, 245 F.3d at 296-98. The district court calculated her sentence based on the guidelines applicable to money laundering, and the defendant appealed. See id. at 296.

On appeal, we examined Smith and the cases applying its methodology. See id. at 305-08 (citing and discussing Mustafa, 238 F.3d at 488-96; United States v. Bockius, 228 F.3d 305, 309-13 (3d Cir. 2000); United States v. Cefaratti, 221 F.3d 502 (3d Cir. 2000); Smith, 186 F.3d at 297-300). We found these cases rejected a reading of Smith that would limit the use of the money laundering guidelines only to cases involving the proceeds of drug trafficking and organized crime. See id. at 309. Instead:

> Mustafa, Bockius, Cefaratti, and Smith all are in accord that the heartland of the money laundering guidelines includes, in addition to drugs and organized crime, cases involving typical money laundering, financial transactions that are separate from the underlying crime and that are designated either to make illegally obtained funds appear legitimate, to conceal the source of some funds, or to promote additional criminal conduct by reinvesting the funds in additional criminal conduct.

Id. at 309-10. We distinguished these types of cases from "ordinary cases of routine fraud, . . . the simple receipt and deposit or use of illegally obtained funds, or . . . cases in which any money laundering is not separate from the underlying fraud, but merely an `incidental by product' of that underlying fraud." Id. at 310. Therefore, "where the defendant has not made a serious, concerted effort to conceal or to legitimize the funds or to reinvest them in additional criminal activity, it is not appropriate to sentence that defendant under the money laundering guideline." Id.

Applying these principles, we found that the district court improperly sentenced the defendant under the money

14

laundering guidelines rather than the fraud guidelines. See id. at 311. The defendant, while having violated the money laundering statute by engaging in a monetary transaction in criminally derived property, neither used the proceeds of her fraudulent activities to promote additional criminal conduct, nor made any effort to disguise the source or nature of the funds.13 See id. We deemed the defendant's deposit of the student assistance funds to be inseparable from and an incidental by-product of the fraud and minimal in comparison to the totality of the unlawful conduct. See id. Therefore, we vacated the defendant's sentence and remanded the matter for resentencing under the fraud guidelines. See id. at 312.

Omoruyi contends his sentence should have been calculated under the fraud guidelines because his money laundering conduct was minimal and incidental to the mail fraud. We reject that argument and hold that the court properly sentenced Omoruyi under the money laundering guidelines. First, the conduct charged in the indictment, eight teller window withdrawals, was separate from the underlying crime of obtaining fraudulently and mailing the convenience checks to the various banks. Further, this case is distinguishable from Diaz as there the money laundering count was predicated only on the defendant's deposit of the federal student assistance checks in the school's bank account. Arguably, had Omoruyi merely deposited the checks, his conduct would not be deemed separate from the underlying crime, and this case would be more akin to Diaz. However, Omoruyi took the additional step of withdrawing the proceeds of his criminal conduct, an activity clearly not part of the underlying mail fraud.

Second, Omoruyi's conduct involved a concerted effort to conceal or to legitimize the funds obtained through the mail fraud. In that regard, this case is quite similar to Mustafa.

_____

13. Diaz pled guilty to violating 18 U.S.C. S 1957(a) which makes it illegal
to "knowingly engage[ ] . . . in a monetary transaction in criminally derived property . . . and is derived from specified unlawful activity. . . ."
Therefore, unlike section 1956(a)(1), section 1957(a) contains neither a promote nor a conceal element. That Diaz was prosecuted under a different money laundering statute, however, does not affect our analysis under Smith.

15

In conduct similar to that of the defendant in Mustafa, though on a lesser scale, Omoruyi deposited approximately $75,000 worth of fraudulently obtained convenience checks in various bank accounts. Also, as in Mustafa , the deposits were intended to conceal the source and nature of the proceeds and create an appearance of their legitimacy. Moreover, Omoruyi laundered the proceeds through accounts he opened using two different aliases, further compounding his attempts to conceal the funds and his control over them.

Finally, in Mustafa we found that the fact that the defendant had to deposit the food stamps for them to have value did not negate the fact that he engaged in money laundering. See Mustafa, 238 F.3d at 496. This conclusion renders unmeritorious Omoruyi's contention that the mail fraud was not complete until he received the funds from those offenses because before then the proceeds of the criminal conduct were of no use. Therefore, we find that under the version of the sentencing guidelines prior to their November 1, 2000 amendment, the district court appropriately sentenced Omoruyi under the guidelines applicable to money laundering.

III. CONCLUSION

For the foregoing reasons, we will affirm the judgment and sentence of the district court entered December 12, 2000.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

16