UNITED STATES of America,
Plaintiff,

v.

Bonita WORLEY, Defendant.

No. CR.A. 01–65–GMS.

United States District Court,
D. Delaware.

Sept. 16, 2002.

Colm F. Connolly, United States Attorney, Keith M. Rosen, Assistant United States Attorney, Wilmington, Delaware, for the Government.

Penny Marshall, Acting Federal Public Defender, Wilmington, Delaware, for the Defendant.

### MEMORANDUM OPINION

SLEET, District Judge.

## I. INTRODUCTION

A Grand Jury indicted Bonita Worley ("Worley") and her co-defendant, David H. Brown, II ("Brown") on September 25, 2001. The indictment contained six charges, including two mail fraud counts, one count of interstate transportation of stolen motor vehicles, one count of money laundering, and two conspiracy counts. The Honorable Roderick R. McKelvie held a jury trial on these charges from May 20 to May 28, 2002.[1] At the conclusion of the case, the jury returned a guilty verdict against Worley on four of the six counts charged in the indictment: conspiracy to commit mail fraud (Count I), mail fraud (Count III), conspiracy to commit money laundering (Count V), and money laundering (Count VI).

Presently before the court is Worley's motion for judgment of acquittal. For the reasons that follow, the court will deny this motion.

## II. STANDARD OF REVIEW

In reviewing a motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *U.S. v. Smith*, 294 F.3d 473, 476 (3d Cir.2002) (citing *U.S. v. Wolfe*, 245 F.3d 257, 262 (3d Cir.2001)). Further-

more, the court is required to "draw all reasonable inferences in favor of the jury's verdict." *See id.* (citing *U.S. v. Anderskow*, 88 F.3d 245, 251 (3d Cir.1996)). Thus, a finding of insufficiency should "be confined to cases where the prosecution's failure is clear." *See id.* (citing *U.S. v. Leon*, 739 F.2d 885, 891 (3d Cir.1984)).

With this standard in mind, the court will now describe the facts and evidence adduced during Worley's trial.

## III. BACKGROUND

In the early 1990s, pursuant to a City ordinance, the City of Wilmington created a non-profit organization called the Wilmingtonians. This non-profit organization was responsible for the execution of programs designed to benefit the City of Wilmington's residents. Such programs included the Neighborhood Ambassadors' Program ("NAP"), the City of Wilmington Academic Scholarship Program, and the Self Help Improvement Program ("SHIP"). The mission of the Wilmingtonians was to advise and assist Wilmington City government in improving the quality of life in Wilmington's neighborhoods.

The Wilmingtonians was funded almost entirely by the City, and was functionally a City operation. The ordinance, as well as the company's Certificate of Incorporation, provided that, upon dissolution, all of the Wilmingtonians' assets would revert back to the City of Wilmington. As a result, members of the Wilmingtonians' Board of Directors considered all of the company's property to be owned by the City. *See* Transcript of Trial ("Tr.") at C–76. The company's incorporation documents also provided that no part of the net earnings of the company, with the exception of regular salaries, could inure to the benefit of any officers or other private persons.

---

1. On June 12, 2002, the case was transferred to the present court due to Judge McKelvie's retirement from the bench.

During the period from approximately September 2000 until approximately February 6, 2001, Brown was the Executive Director, and then President, of the Wilmingtonians. In this capacity, Brown was responsible for the day-to-day operations of the Wilmingtonians. His actions were overseen by a twenty-three member Board of Directors (the "board"), which was appointed by the Mayor. A five-member subset of the board, known as the "Shareholders," was responsible for the operations of the company between board meetings. During the period from approximately September 2000 until approximately January 26, 2001, Worley was the Community Outreach Specialist for the Wilmingtonians. She was also responsible for administering the SHIP program.

### A. The Census and Bowling Green Checks

In 2000, the Wilmingtonians NAP program distributed census awareness fliers in Wilmington's neighborhoods for the U.S. Census Bureau.[2] On April 20, 2000, the Wilmingtonians submitted an invoice to the Census Bureau requesting its payment for this service. On September 6, 2000, the U.S. Treasury issued a $1,160.00 check payable to the Wilmingtonians. Instead of depositing the check in the Wilmingtonians' bank account, Brown endorsed the check to Worley, and Worley deposited the check in her personal bank account. See Tr. at C–130–131, D–105. Brown and Worley never told the Wilmingtonians' accountant that this money had been so diverted.[3] See Tr. at B–76, D–105.

On October 4, 2000, the Wilmingtonians paid $3,850.00 to Bowling Green of Brandywine, a drug and alcohol treatment facility, for Worley's treatment services. Worley completed only one day of treatment. Accordingly, on November 22, 2000, Bowling Green issued a refund check in the amount of $3,575.00, payable to the Wilmingtonians. As with the census check, this money was not deposited into the Wilmingtonians' bank accounts. Instead, the refund check was endorsed by Brown, and deposited into Worley's personal checking account on December 26, 2000. See Tr. at C–114, D–109–110. One week later, on January 3, 2001, Worley signed a check in the amount of $3,350.00 on her account, made payable to Brown. See Tr. at C–115–117, C–132. Brown cashed this check on the same day at a grocery store bank teller window. See Tr. at C–115–117. Though signed by Worley, the check was drawn in Brown's handwriting. See Tr. at D–88–89. There was no record of this money ever having been deposited in the Wilmingtonians' bank accounts. See Tr. at C–139.

### B. The End of the City Funding and the $56,000.00 Check

In January 2001, James Baker began his term as Mayor of Wilmington. In the beginning of that month, representatives of the Mayor's office met with Brown and advised him that the City funding for the Wilmingtonians would be terminated. The City also notified the Wilmingtonians by letter that it had until January 26, 2001 to return all property, including motor vehicles, to the City. The letter also advised the Wilmingtonians that the City intended to conduct a complete audit of the company's finances.

Absent the City funding, or replacement funding from other sources, the Wilming-

---

2. Worley was not personally involved in this project, and did not personally fund the project in any fashion.

3. Per office policy, all mail containing checks to the Wilmingtonians would be delivered unopened directly to Brown. See Tr. at A–159.

tonians did not have the financial means to survive for more than a few months. The organization was thus on the verge of financial collapse in January 2001. *See* Tr. at A–173, B–59. Brown recognized this fact and advised board member Wilbert Miller that the Wilmingtonians would have to "close shop." *See* Tr. at C–8. At a Shareholders' meeting in January 2001, Brown similarly informed board member Clarence White that the organization was "broke." *See* Tr. at C–78. Indeed, by February 9, 2001, all the NAP employees had been laid off.

Despite this financial collapse, on January 29, 2001, Brown transferred $64,000.00 from various Wilmingtonians bank accounts into the Wilmingtonians' NAP operating account. *See* Tr. at B–64–66. He then wrote a second $56,000.00 check on that account, made payable to Worley. *See id.* At trial, the Government contended that Worley's payment was not authorized and, if legitimate, would have represented the single largest one-time expenditure for the organization in the previous two years. In order to disguise this payment and make it appear to be a legitimate business expense, the Government maintains that Brown and Worley took steps to create the appearance that this check was paid as a consulting fee.

Specifically, the Government contends that Brown and Worley created fraudulent documents including a "proposal" letter and an "acceptance" letter. According to the Government, the purpose of these documents was to suggest that the Wilmingtonians had entered into a consulting agreement with Worley through a consulting business called "Consult Tech." *See* Tr. at A–176–178. These documents were dated January 29, the same day that the $56,000.00 check was written and deposited in Worley's bank account. *See* Tr. at A–176–177. The check to Worley had the notation "Consult Tech" on the memo line as well. *See* Tr. at B–67.

On January 29, 2001, Brown also had a conversation with Michael Harris ("Harris"), the Vice President of the Wilmingtonians. *See* Tr. at A–175–177. In that conversation, Brown stated that Worley would be hired as a consultant. He asked Harris to put his signature on the "acceptance" letter. *See id.* Harris testified that his only knowledge that Worley was to work as a consultant, or that she even had a consulting business, came from Brown. *See* Tr. at B–43–44. Harris further testified that Brown never showed him the "proposal" letter, nor did Brown tell him that Worley's "fee" was $56,000.00. *See* Tr. at A–177–178.

Neither Harris, nor any of the board members who should have approved the disbursement were aware of the $56,000.00 payment until a cancelled check appeared the following month. *See* Tr. at A–175, C–16–17, C–79. They were also made aware of this disbursement when the local newspaper reported the check's existence. *See id.* No other documents relating to this check were ever shown to the board, either before, or after, the check was paid. *See* Tr. at C–62, C–80.

On January 29, 2001, Worley also applied to the Delaware Department of Revenue for a Delaware sole proprietorship business license in Consult Tech's name. *See* Tr. at B–147–148. The Department of Revenue subsequently mailed her a license. *See id.* This application, however, contained a false business address.[4] *See*

---

4. Worley listed 212 W. 24th Street, Wilmington, as her business address on the application. In fact, however, 212 W. 24th Street was the residence of Robert Starling, Worley's stepfather. Starling testified that Worley never lived or operated a business out of that address, nor did she even have the keys to the residence. *See* Tr. at B–170.

Tr. at B–147. Additionally, no taxes or other returns have ever been filed with the state by "Consult Tech," including the gross receipts tax that would have been due on the $56,000.00 if it had been received as a legitimate business receipt. *See* Tr. at B–153.

Worley deposited the $56,000.00 check in her personal checking account on January 29, 2001. *See* Tr. at C–119–120. During the subsequent six weeks, she wrote a substantial number of checks on that account, including multiple checks to "cash," and a February 28, 2001 check to Brown in the amount of $1,600.00. *See* Tr. at C–118, C–133–135. As with the $3,350.00 check from the Bowling Green proceeds, this check was signed by Worley, but written by Brown. *See* Tr. at D–89–90. By March 19, 2001, the balance in Worley's account was only $10,296.26. *See* Tr. at C–135.

The Government further maintains that there is no credible evidence that Worley or Consult Tech ever performed any consulting work for the Wilmingtonians on or after January 29, 2001. The evidence adduced at trial in this regard showed that Worley had generated a document purporting to be a "status report" of the work she had performed as a consultant. This document states that it was to be transmitted to Minister Maimouna M'Backe ("M'Backe"), Chair of the Wilmingtonians, and Vice President Harris. However, neither M'Backe, nor Harris, had seen this document prior to the trial. *See* Tr. at A–113, A–180–181. Moreover, the "status report" refers to work on projects unknown to Harris. *See* Tr. at A–183.

### C. The Sale of the Suburban

In the fall of 2000, the Wilmingtonians owned a 1999 Chevrolet Suburban as part of its vehicle fleet. *See* Tr. at A–171, B–78. In October 2000, Brown, acting on behalf of the Wilmingtonians, purchased a new 2001 Suburban, using the trade-in value of the 1999 Suburban and $41,173.56 in Wilmingtonians funds to complete the transaction without financing. *See* Tr. at A–171, B–78, B–80–81. The Wilmingtonians were listed as the registered owners of the 2001 Suburban. *See* Tr. at B–79. As of January 31, 2001, the vehicle had an approximate value of $30,000.00. *See* Tr. at B–220–221.

In late January 2001, the Government contends that Brown and Worley attempted to defraud the Wilmingtonians of the Suburban's value by orchestrating the vehicle's sham sale to Robert Starling ("Starling"), Worley's stepfather. In January 2001, Worley approached Starling and told him that Brown had a truck for sale. *See* Tr. at B–173. Starling told Worley that he would be interested in the truck, and she arranged for him to meet with Brown. At that time, Brown told Starling that he would sell his truck to Starling for $100. *See* Tr. at B–174. Starling asked both Worley and Brown if the sale was legal, and both said that it was. *See* Tr. at B–175–176. Starling did not know what kind of truck was at issue until he received the title from Brown and took it to the Department of Motor Vehicles. *See* Tr. at B–174–175. The Board of Directors was unaware of this supposed sale. *See* Tr. at A–116. In fact, they had not authorized Brown to sell the vehicle at all, let alone for an approximately $29,900.00 loss. *See* Tr. at B–8.

On January 30, 2001, the day after Worley received the $56,000.00 check, Brown transferred the Suburban's title to Starling. *See* Govt. Exhibit 16. The next day, January 31, 2001, Worley took Starling to West Chester, Pennsylvania to trade in the Suburban on another vehicle. *See* Tr. at B–179, B–225. Starling testified that, on the way to West Chester, he and Worley stopped at a McDonald's restaurant,

where, to his surprise, Brown was waiting.[5] See Tr. at B–180–181. Starling remembers Brown stating that he would go to the car dealerships with them. See Tr. at B–181. Worley then directed Starling to the Land Rover of West Chester dealership. See Tr. at B–182. At the time they departed, Starling testified that he had no intention of trading the Suburban in for a Range Rover. See Tr. at B–180, B–182.

Dale Wennagel ("Wennagel"), their sales guide at the dealership, testified that Brown personally negotiated the trade-in of the Suburban toward the purchase of a 1997 Range Rover.[6] See Tr. at B–220, B–222–225. These negotiations covered the sales price, as well as some extras that Brown requested be added to the vehicle. See Tr. at 224–225. Wennagel also testified that Brown took the Range Rover for a test drive. See Tr. at 219. The Suburban was traded in as part of the deal, with a trade-in value of $30,000. See Tr. B–220–221. Wennagel testified that he did not realize until the deal was nearly completed that the named buyer and registrant of the Range Rover would be Starling, not Brown. See Tr. at B–220, B–225.

With taxes and fees, the final value of the Range Rover was $34,149.25. See Tr. at B–222, see also Govt. Exhibit 17. Worley paid the difference above the trade-in value of the Suburban by using a check drawn on the account containing the $56,000.00 that she had received from Brown two days before. See Tr. at B–222–223. According to Starling, Worley stated at the time that she was providing this money as a gift to him. See Tr. at B–198.

The sale of the Range Rover was completed, and the vehicle was titled in Starling's name. See Tr. at B–225. Starling knew, however, that a Range Rover was the wrong type of car for his neighborhood. See Tr. at B–199. He feared that it might be stolen on his street. See id. In addition, he did not have insurance to cover such a vehicle. See Tr. at B–186. Starling testified that he only drove the Range Rover on two occasions between January 31 and February 15, 2001. See Tr. at B–184. He then stored the Range Rover at a public storage garage in New Castle County. See Tr. at B–186–187. After that point, Worley maintained possession of the vehicle, holding the keys to the Range Rover and the key to the lock on the garage door. See Tr. at B–187–190. Starling testified that if he had wanted access to the car, he would have had to contact Worley. See Tr. at B–211.

Although Starling only drove the vehicle on two occasions, Brown and Worley drove the car for over 300 miles during the period from January 31 to February 15, 2001. See Govt. Exhibit 18F. Indeed, Wennagel testified that Brown himself picked up the Range Rover from the dealership when the negotiated extras that he had requested had been installed. See Tr. at B–228–230, see also Govt. Exhibit 18F. Brown also drove the Range Rover on a trip to Silver Spring, Maryland after the car had been placed into the storage garage. See Tr. at D–33.

As with the $56,000.00 check, Harris and the Board of Directors were unaware that Brown intended to sell the Suburban for

---

5. At trial, Brown denied meeting Worley and Starling at the McDonalds. See Tr. at D–29. He claimed that he was working in his office on January 31, when Worley came to him and asked if he would accompany her and her father to the car dealership so her father would not be taken advantage of by salesmen. See id.

6. In contravention to this testimony, Brown testified that he did not participate in any negotiations for the Range Rover. See Tr. at D–30, D–32, D–92–93. Rather, he testified that he spent the entire time outside the showroom, smoking cigars. See Tr. at D–30, D–32.

$100.00, nor had they authorized such a sale. *See* Tr. at C–12. In fact, as of the board meeting on February 13, 2001, the whereabouts of the Suburban were unknown. *See* Tr. at B–9.

During the trial, two board members, Wilbert L. Miller ("Miller") and Clarence White ("White"), testified that they were shocked and upset to learn of the Suburban's sale for $100.00, as well as the $56,000.00 payment to Worley. *See* Tr. C–10, C–83. Brown had not notified the board of these transactions, nor had they seen any documents relating to these transactions. *See* Tr. at C–80. Indeed, some of the board members first learned of these transactions when they were reported in the newspaper. *See* Tr. at C–9, C–16, C–82. Further, White testified that the board believed that the Suburban should have been returned to the City pursuant to its January 26 letter. *See* Tr. at C–84.

Finally, Miller and White testified that the above transactions were matters that should have been presented to the board for approval prior to their execution. *See* Tr. at C–15, C–30, C–63, C–109. Additionally, Brown testified that he was aware that he could not make a $56,000.00 payment to an insider, nor sell the Suburban to himself for $100.00 under the insider transaction prohibitions contained in the Wilmingtonians by-laws and articles of incorporation. *See* Tr. at D–96–97.

## IV. DISCUSSION

The jury returned a guilty verdict against Worley on the following four counts: (1) mail fraud; (2) money laundering; (3) conspiracy to commit money laundering; and (4) conspiracy to commit mail fraud. As Worley has moved for a judgment of acquittal on each of these grounds, the court will discuss them in turn.

## A. Mail Fraud

At trial, the Government had the burden of proving that Worley had engaged in a scheme or artifice to defraud a proper entity of the intangible rights of honest services, or to obtain money or property by materially false and fraudulent pretenses, representations, or promises. *See U.S. v. Pharis,* 298 F.3d 228, 234 (3d Cir. 2002). The Government must also have shown that Worley knowingly participated in the scheme to defraud. *See id.*

■ The essence of the allegations in Count III is that Worley and Brown fraudulently obtained the $56,000.00 check by creating the appearance that the check was paid pursuant to a consulting agreement with Worley. Worley now claims that, because the evidence showed that a legitimate consulting deal did, in fact, exist, the jury erred in convicting her on this count. Viewing the evidence in the light most favorable to the Government, the court must disagree.

The evidence at trial showed that the $56,000.00 payment was the largest single disbursement from the Wilmingtonians' accounts in the previous two years. It was paid at a time when the company was in financial disarray. Accordingly, the Government argued that the payment of the equivalent of one month's operating expenses for a consultant made no practical sense. Moreover, the only individuals who were aware of the payment were the defendants. No documents were presented to the board of directors or the accountant. Indeed, during the trial, two board members testified that they had only learned of the check upon reading about it in the newspaper.

The Government then argued that, knowing that a cancelled check would eventually appear, the defendants created fraudulent documents to give the appearance of a paper trail for the payment of a

legitimate consulting check. The evidence elicited during the trial demonstrated that the "proposal" letter was never seen by anyone other than the defendants. Although Harris testified that Brown informed him that he had hired Worley as a consultant, Harris also testified that his only knowledge of this transaction came from Brown himself. He further testified that Brown never showed him the "proposal" letter, nor was he aware that Worley's fee was $56,000.00.

Moreover, the evidence showed that Worley applied for a business license in the name of "Consult Tech" on the same day that the check was paid. The business license application, however, contained a fraudulent business address. From this evidence, the jury could have reasonably concluded that there was no actual business address because such a business did not exist.

Furthermore, the jury could have reasonably concluded that Worley never actually performed any consulting work for the Wilmingtonians. Although there was evidence during the trial that Worley had created a "status report" outlining her accomplishments, the intended recipients, Harris and M'Backe, testified that they had never seen it. Harris also testified that the document described work projects, such as NAP Direct, which, to his knowledge, did not exist. Thus, the jury could have concluded that the status report, like the "proposal" letter, was not a legitimate business document, but rather a document created in furtherance of the scheme to defraud. Finally, the jury could have concluded that Worley's subsequent

payment of a portion of the $56,000.00 to Brown constituted a kickback.

In light of the foregoing, Worley's argument that the evidence could only support the conclusion that the $56,000.00 check was paid pursuant to a legitimate consulting contract is without merit. Viewing the evidence in the light most favorable to the government, as it must, the court concludes that the evidence supports the jury's conclusion that the consulting deal was a sham in support of the defendant's fraudulent scheme.

In her motion, Worley also suggests that the jury verdict that the City of Wilmington was defrauded cannot stand.[7] The court must disagree. The evidence adduced at trial demonstrated that the Wilmingtonians was created by City Ordinance and existed in order to effect certain City neighborhood improvement projects. The organization was almost entirely funded by the City, and its assets would revert to the City upon dissolution of the organization. Furthermore, at the time of the fraudulent conduct alleged in Count III, the City had terminated the funding for the program. It had also demanded a return of the Wilmingtonians' property and was planning to conduct an audit of the company's finances. On this record, a reasonable jury could have concluded that both the City and the Wilmingtonians were defrauded of property and the right to honest services.

Accordingly, the court will deny Worley's motion for judgment of acquittal on the mail fraud count.

---

7. At the outset, the court notes that a decision on this claim would have no effect on the judgment in this case because the jury found, by special verdict, that both the City and the Wilmingtonians were the victims of the fraud alleged in Count III. *See* Verdict Form, D.I.

52. Worley does not challenge the conclusion that the Wilmingtonians were a victim of the fraudulent scheme. Thus, even if the City was not defrauded, the verdict on Count III would nevertheless stand.

## B. Money Laundering

To sustain a money laundering verdict, the Government must prove that there was: (1) a financial transaction; (2) involving proceeds of a specified unlawful activity; (3) knowledge that the transaction involves proceeds of some unlawful activity; and (4) knowledge that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *See* 18 U.S.C. § 1956(a)(1)(B)(i); *see also U.S. v. Omoruyi*, 260 F.3d 291, 294–95 (3d Cir. 2001).

■ In convicting Brown and Worley of money laundering, the jury concluded that the defendants conducted a financial transaction, *i.e.*, the purchase of the Range Rover, which involved the proceeds of their fraudulent scheme, *i.e.*, the Suburban and a portion of the $56,000.00, designed in whole, or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds. Worley contends that there was no evidence at trial to prove that she did anything to disguise the ownership of the Suburban. Again, the court must disagree.

At trial, the Government argued that the actual owners and operators of the Suburban and the Range Rover were the defendants. To this end, the Government adduced evidence that the defendants caused the Suburban to be converted into a Range Rover titled in Robert Starling's name. The Government maintained that, by so doing, there was no direct line between the ownership of the vehicle and the defendants; instead, there was a direct line to Robert Starling.

At least one Court of Appeals has found just such a transaction to be a classic money laundering scheme. In *U.S. v. Norman*, the defendant fraudulently obtained proceeds from the victim's bank account. 143 F.3d 375, 377 (8th Cir.1998). He then transferred the funds into the account of a business under his control, and purchased a 1993 Range Rover with a check drawn on the business account. *See id.* The vehicle was titled in the name of the business, but the defendant made no effort to conceal his own identity from the car's seller. *See id.* The Eighth Circuit upheld a money laundering conviction on these facts, finding that:

> [B]y changing the proceeds of unlawful activity from the form of money (or, more properly a bank account)—through the use of other, undisclosed business accounts—into the form of an automobile, [the defendant] made it more difficult for the true owner of the money to trace what happened to it.

*Id.*

The court concludes that the same logic applies to the present facts. Thus, it was reasonable for the jury to conclude that, by converting the Suburban into a Range Rover through the use of Robert Starling as a nominee owner, the defendants made it more difficult for the Wilmingtonians to trace what had happened to its vehicle.

Worley claims, however, that there can be no concealment because she went to the Land Rover dealership and paid a portion of the cost of the vehicle with a check in her name. In rejecting a similar argument, however, the Eighth Circuit noted that the point is not whether the *seller* of the car was deceived, but whether, by changing the form of the proceeds, the defendant's actions made it more difficult for the true owner to trace what had happened to the proceeds.[8] *See id.* More-

---

8. As a factual matter, the jury could have also reasonably concluded that Worley did attempt to conceal her stake in the purchase of the vehicle because she claimed that the check was given to Starling as a gift. By making this statement, Worley was furthering the notion that Starling was the owner of the car.

over, that the concealment scheme was ultimately unsuccessful and relatively easy for investigators to pierce does not place the conduct beyond the reach of this crime. *See U.S. v. Jackson,* 935 F.2d 832, 842 (7th Cir.1991).

Worley also contends that the concealment element is lacking because the proof at trial only supports the conclusion that the proceeds were spent, not concealed. In support of her position, Worley relies on *United States v. Sanders,* 929 F.2d 1466 (10th Cir.1991). In that case, the defendant purchased two vehicles using drug proceeds. *See id.* at 1471. The defendant then titled the vehicles in his daughter's name. *See id.* The Tenth Circuit found the use of the daughter's name insufficient to prove concealment because she had the same last name as the defendant. *See id.* at 1472. The court thus found that the purchase was too conspicuous to be considered an act of concealment. *See id.*

The court concludes that the present case is distinguishable from *Sanders* for three reasons. First, the Range Rover was not only titled in Starling's name, he ostensibly "bought" it with the Suburban, which was also titled in his name. Second, Worley made a false statement to the car dealer, claiming that the money she contributed toward the purchase of the car was a "gift," thereby arguably evincing the intent to conceal. Third, Starling and Worley do not have the same last name.

Indeed, contrary to Worley's position, the evidence at trial does support a finding of concealment. Specifically, it indicated that the defendants engaged in a financial transaction that itself was unusual. The evidence further indicated that the transaction involved a third party to disguise the source of the expenditure. This use of a third party's name has typically been sufficient to establish the concealment element. *See U.S. v. Bowman,* 235 F.3d 1113, 1117 (8th Cir.2000); *U.S. v. Fields,* 72 F.3d 1200, 1211 (5th Cir.1996). In *Bowman* and *Fields,* the defendants used ill-gotten proceeds to purchase a vehicle. *See Bowman,* 235 F.3d at 1117, *Fields,* 72 F.3d at 1211. They then titled that vehicle in the name of a third-party. *See Bowman,* 235 F.3d at 1117, *Fields,* 72 F.3d at 1211. In both cases, the Courts of Appeal concluded that the use of a third-party name was sufficient to demonstrate knowing concealment. *See Bowman,* 235 F.3d at 1117, *Fields,* 72 F.3d at 1211. Similarly, in *U.S. v. Omoruyi,* the defendant deposited the proceeds of his illegal activities into a bank account, using a third-party name. 260 F.3d 291, 296 (3d Cir.2001). The defendant then withdrew the funds from that account. *See Omoruyi,* 260 F.3d at 296. On those facts, the Third Circuit found that the use of a third-party name converted the transaction from mere spending of the proceeds into concealment of the proceeds. *See id.* at 296 and n. 6; *see also Jackson,* 935 F.2d at 842 (same).

Additionally, a design or intent to conceal may be inferred when a defendant transfers proceeds of unlawful activity into the control of others with whom the defendant has a very close relationship. *See Bowman,* 235 F.3d at 1116. In *Bowman,* for example, the defendant deposited the proceeds at issue into his girlfriend's checking account. She then used those proceeds to make various purchases. The Eighth Circuit concluded that the transformation of the proceeds into the girlfriend's account—with whom the defendant had a close relationship—was sufficient to show design to conceal. *See id.* The court finds that this reasoning applies equally well to the facts of the present case. By placing the Range Rover in her stepfather's name, and briefly in his possession, Worley was able to maintain actual possession of the vehicle while concealing her ownership interest.

Accordingly, the court will deny Worley's motion for judgment of acquittal on the money laundering count.

## C. The Conspiracy Counts

The jury convicted Worley of conspiracy to commit mail fraud and conspiracy to commit money laundering. Worley now contends that a judgment of acquittal on these counts is warranted because the Government produced no evidence of secret meetings or agreements to discuss the substantive offenses.

■ Contrary to Worley's assertion, however, a conspiracy need not involve an express agreement and may consist of nothing more than a tacit understanding. *See U.S v. Scanzello*, 832 F.2d 18, 20 (3d Cir.1987); *see also U.S. v. Mohr*, 728 F.2d 1132, 1135 (8th Cir.1984). Indeed, all the elements of a conspiracy, including the agreement, can be proven entirely through circumstantial evidence. *See Scanzello*, 832 F.2d at 20. Specifically, the existence of an agreement can be inferred from "evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants ... could not have been carried out except as the result of a preconceived scheme or understanding." *U.S. v. Kapp*, 781 F.2d 1008, 1010 (3d Cir.1986).

■ In the present case, the Government adduced evidence which showed Brown and Worley acting in tandem. The jury heard that Brown deposited the Bowling Green refund check into Worley's bank account and that Worley then wrote Brown a check for a portion of these proceeds. Indeed, the evidence showed that this check was signed by Worley, but written by Brown. Similarly, the evidence showed that Worley and Brown each drafted fraudulent documents purporting to establish the existence of the consulting agreement. It further demonstrated that Brown wrote the $56,000.00 check to Wor-

ley's account, and that Worley again signed over a portion of these funds to Brown. The text of this check was again written by Brown himself. It would thus be reasonable for the jury to infer the existence of an agreement and concerted action from these facts.

■ With regard to the sale of the Suburban to Starling, the evidence showed that Worley initially arranged for Starling to meet with Brown to discuss the sale. There was also evidence that Worley and Brown arranged to accompany Starling to the Land Rover dealership to trade in the vehicle the next day. Finally, telephone records submitted into evidence showed that Brown and Worley were in close telephone contact throughout the period of the conspiracy. Thus, the inference of an agreement is logical. The fact that this evidence may also permit a less sinister conclusion is immaterial. *See U.S. v. Smith*, 294 F.3d 473, 478 (3d Cir.2002).

Accordingly, because a reasonable jury could have concluded that a conspiracy existed, the court will deny Worley's motion for judgment of acquittal on each of these grounds.

## V. CONCLUSION

Viewing the evidence in the light most favorable to the Government, the court concludes that a jury could have reasonably convicted Worley of mail fraud, money laundering, and conspiracy to commit both mail fraud and money laundering. The court will issue an order in conjunction with this opinion.